UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>NICOLAS VASQUEZ, II,<br><br>　　　　　Defendant. | No. 2:25-cr-135-WBS<br><br>MEMORANDUM AND ORDER RE:<br>DEFENDANT'S MOTION TO DISMISS |

----oo0oo----

Defendant Nicolas Vasquez, II was indicted on May 29, 2025, and charged with unlawfully possessing ammunition in violation of 18 U.S.C. § 922(G)(1). (Docket No. 1.) Because Vasquez was found to qualify for appointment of counsel, at his initial appearance on June 2, 2025, the Federal Defender was appointed to represent him. (Docket No 7.) Later, on August 4, 2025, because Vasquez was dissatisfied with the representation being afforded to him by the Federal Defender, the court referred the matter for appointment of outside counsel to represent him. (Docket No. 21.) On August 6, 2025, the court ordered present

1

1  counsel Danica Mazenko appointed to represent defendant pursuant
2  to the Criminal Justice Act (CJA), 18 U.S.C. § 3006A.  (Docket
3  No. 23.)
4       Vasquez, through his newly appointed attorney, has now
5  filed a motion to dismiss the charges against him with prejudice,
6  claiming a deprivation of his right to counsel as guaranteed by
7  the Sixth Amendment to Constitution.  U.S. Const. amend. VI; see
8  also Gideon v. Wainwright, 372 U.S. 335, 340 (1963).  (Docket No.
9  34.)  Vasquez argues that due to the ongoing lapse in federal
10 funding, "[t]he prolonged non-payment of appointed counsel
11 violates Defendant's Sixth Amendment rights and the fundamental
12 guarantee of Gideon v. Wainwright, warranting dismissal of the
13 indictment."  (Id. at 6.)
14      Vasquez alleges that funding for defense counsel
15 appointed under the CJA was depleted in July 2025 with the result
16 that his counsel "has been working without significant
17 compensation on CJA cases since June 2025."  (Docket No. 34 at
18 2.)  As a result of this delay in CJA reimbursements, he argues
19 that "an untenable conflict between counsel's professional
20 obligations and their basic economic survival" has been created
21 that "undermines the attorney-client relationship and compromises
22 the quality of representation guaranteed by the Sixth Amendment."
23 (Id. at 2-3.)
24 I.   There is no constitutional right to compensation for court-
          appointed counsel in these circumstances.
25
26      The Sixth Amendment does not require that court-
27 appointed counsel be compensated.  Gideon v. Wainwright, 372 U.S.
28 335 (1963), establishes that indigent defendants have a right to

2

court-appointed counsel, and Strickland v. Washington, 466 U.S. 668 (1984), mandates that defendants receive effective assistance of counsel. However, there is nothing in the Constitution, and nothing in Gideon, Strickland, or their progeny, requiring that counsel receive compensation for representing an indigent criminal defendant.

To the contrary, numerous federal courts have repeatedly and explicitly held that court-appointed counsel do *not* have any constitutional right to compensation. See Scheehle v. Justs. of Supreme Ct. of Ariz., 508 F.3d 887, 894-95 (9th Cir. 2007) ("The position that any imposition on an attorney's time must be compensated is foreclosed by our prior opinions.") (cleaned up); see also United States v. Dillon, 346 F.2d 633 (9th Cir. 1965), cert. denied, 382 U.S. 978 (1966); United States v. 30.64 Acres of Land, 795 F.2d 796, 803 (9th Cir. 1986) ("If a court determines that a case has sufficient merit and a litigant sufficient need to justify uncompensated representation by counsel, we are confident that individual members of the bar will respect that decision and provide the needed services.") (citing Rhodes v. Houston, 258 F.Supp. 546, 579 (D.Neb. 1966) ("To the credit of the legal profession, it may be declared that such a *refusal* will rarely occur.") (emphasis in original), aff'd, 418 F.2d 1309 (8th Cir. 1969), cert. denied, 397 U.S. 1049 (1970)); Powell v. State of Alabama, 287 U.S. 45, 73 (1932) ("Attorneys are officers of the court, and are bound to render service when required by such an appointment."); Peterson v. Nadler, 452 F.2d 754, 758 (8th Cir. 1971); Fam. Div. Trial Laws. of Superior Ct.-D.C., Inc. v. Moultrie, 725 F.2d 695, 705 (D.C. Cir. 1984)

3

("[T]here is no facial unconstitutionality to the statute or rules that require appointments in uncompensated cases."). (collecting cases).

In United States v. Dillon, the Ninth Circuit held that there was "an obligation on the part of the legal profession to represent indigents upon court order, without compensation." 346 F.2d 633, 635 (9th Cir. 1965), cert. denied, 382 U.S. 978 (1966). There the court reasoned that:

> An applicant for admission to practice law may justly be deemed to be aware of the traditions of the profession which he is joining, and to know that one of these traditions is that a lawyer is an officer of the court obligated to represent indigents for little or no compensation upon court order. Thus, the lawyer has consented to, and assumed, this obligation and when he is called upon to fulfill it, he cannot contend that it is a "taking of his services."

Id.; cf. Kunhardt & Company, Inc. v. United States, 266 U.S. 537 (1925).

Similarly, in 30.64 Acres of Land, the Ninth Circuit observed that,

> Courts have long recognized that attorneys, because of their profession, owe some duty to the court and to the public to serve without compensation when called on. ... [T]he obligation of the legal profession to serve indigents on court order is an ancient and established tradition, and ... appointed counsel have generally been compensated, if at all, only by statutory fees which would be inadequate under just compensation principles, and which are usually payable only in limited types of cases.

795 F.2d at 800-01.

The Dillon court further explained that decisions about

4

schemes providing for the compensation of court-appointed counsel are the purview of legislatures, not courts:

> The problem of providing some system of compensation for appointed counsel, in light of the developing law of the right of indigents to counsel, is a matter for legislative and not judicial treatment. This fact has been recognized by the Congress in the enactment of the Criminal Justice Act of 1964, 78 Stat. 552. The provisions of the Act clearly show that the compensation provided for in said Act is not based upon the principles of just compensation which appear in the Fifth Amendment.

Dillon, 346 F.2d at 636; see Hurtado v. United States, 410 U.S. 578, 588-89 (1973) (citing Dillon); see also White v. United States Pipe & Foundry Co., 646 F.2d 203, 205 n. 3 (5th Cir. 1981).

Indeed, "[a]ny doubt that a state could require some services from an attorney without compensation was dissolved by our opinion in 30.64 Acres of Land[.]" Scheehle, 508 F.3d at 894-95. That said, some courts have left room for the possibility that an attorney's appointment without compensation may constitute a violation of either the Fifth or Thirteenth Amendments, but these exceptions are especially narrow.[1]

---

[1] In Moultrie, the court opined that where a system for the court-appointment of counsel without compensation "effectively denies [counsel] the opportunity to maintain a remunerative practice before their specialized division, and that specialty practice is determined to be a 'property' interest, it might effect an unconstitutional 'taking.'" 725 F.2d at 706 (cleaned up).

Similarly, the Moultrie court also concluded that no "genuine thirteenth amendment issue" was raised because "[a]n attorney who wishes to take no further assignments is free to either stop practicing before the Family Division, or even to continue to practice without taking CJA-compensated juvenile cases." 725 F.2d at 704-05. According to that court, the key ingredient for establishing a claim of involuntary servitude under the Thirteenth Amendment is the "[i]nability to avoid

5

1      Exceptions which do not apply in this case
2 notwithstanding, on balance the precedent on this question is
3 resoundingly clear.  The position advanced by Vasquez is not
4 merely novel, it runs contrary to the *overwhelming* weight of
5 well-established precedent.

6 II. <u>Vasquez's counsel has not been denied compensation</u>

7      The foregoing discussion is unnecessary, however,
8 because even if Vasquez were constitutionally entitled to counsel
9 who was compensated by the court, his attorney has not been
10 denied compensation.  CJA-appointed counsels' compensation has
11 only delayed, not denied, by the lack of funding, and at this
12 stage in his case Vasquez's counsel is not entitled to receive
13 any compensation.

14      First, CJA-appointed counsel have not been denied
15 compensation due to the government shutdown.  Rather, their
16 compensation has merely been deferred or delayed until such time
17 as Congress funds the government.

18      The United States Courts Defender Services has
19 explained that:

> Fiscal Year 2025 Criminal Justice Act (CJA) panel
> attorney funds were depleted around July 3, 2025.
> Panel attorney payments have been deferred (except for
> one batch of payments on September 18) since that
> date.  The deferred payments from fiscal year 2025,
> and new fiscal year 2026 panel attorney payments,
> continue to be deferred during the current lapse in
> appropriations.  *Panel attorney payments will resume
> when a continuing resolution is passed by Congress and*

---

continued service[.]"  <u>Id.</u>  (citing <u>see</u> <u>Flood v. Kuhn</u>, 443 F.2d 264 (2d Cir. 1971), <u>aff'g</u> 316 F.Supp. 271 (S.D.N.Y. 1970), <u>aff'd on other grounds</u>, 407 U.S. 258 (1972); <u>Wicks v. Southern Pacific Co.</u>, 231 F.2d 130, 138 (9th Cir. 1956), <u>cert. denied</u>, 351 U.S. 946 (1956)).

6

*signed into law by the President.* Please continue to file, process, and approve CJA vouchers as normal during the payment deferrals so that payments can be disbursed as soon as funding becomes available.

UNITED STATES COURTS: DEFENDER SERVICES, CJA Panel Attorney Funds Information FY 2025 (updated: Oct. 6, 2025), https://www.uscourts.gov/about-federal-courts/defender-services/cja-panel-attorney-funds-information-fy-2025 (last visited Oct. 17, 2025) (emphasis added).

Once Congress funds the government, CJA-appointed counsel will be entitled to receive their reimbursements including back-pay. Contrary to Vasquez's claims, then, the government has not refused "to honor its compensation obligations." (Docket No. 34 at 4.) More accurately, the government has deferred the honoring of those obligations. These actions are not the same and Vasquez errs by conflating them.

Second, the government correctly notes that CJA-appointed counsel do *not* receive a salary for representing defendants in federal court. Rather, they submit vouchers requesting reimbursement following the conclusion of their representation. It is the court, not the government, that determines whether, how much, and when the attorney shall be paid. See United States v. Feldman, 788 F.2d 625, 626 (9th Cir. 1986). If waiting to be compensated until the conclusion of representation would pose a hardship on counsel, in exceptional cases the court in its discretion can approve vouchers for interim payments, but there is no suggestion that this is such a case.

Here, counsel for Vasquez was appointed on August 5,

7

2025.  (Docket No. 34 at 1.)  Since taking the case, Vasquez's counsel has received discovery from the government (Docket No. 26 at ¶ 3(a-b)) and jointly moved to continue the status conference until October 20, 2025 (Id. at ¶ 2), and no trial date has been set.  In other words, rather than having concluded, the case against Vasquez is ongoing, and counsel's representation is just beginning.  Further, counsel has not identified any costs which have been incurred in the course of representation and are ready to be submitted for payment.

III. The record does not support a finding of an actual conflict of interest that violates Vasquez's Sixth Amendment rights

"Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest." Wood v. Georgia, 450 U.S. 261, 271 (1981) (citing Cuyler v. Sullivan, 446 U.S. 335 (1980)); see also Holloway v. Arkansas, 435 U.S. 475, 481 (1978).  However, "in order to obtain a dismissal of the indictment," a defendant bears the burden of establishing that he is adversely affected by his representation such that his Sixth Amendment right to counsel has been violated. United States v. Kriens, 270 F.3d 597, 603 (8th Cir. 2001); see also United States v. Solomon, 679 F.2d 1246, 1250 (8th Cir. 1982).

Importantly, when a defendant alleges that he was adversely affected by his counsel's conflict of interest, "the constitutional predicate for his claim" is not satisfied "until [he] shows that his counsel *actively represented conflicting interests*[.]" Cuyler, 446 U.S. at 350 (citation omitted) (emphasis added).  Said another way, "[i]n order to demonstrate a

8

violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." Id.

Here, that burden has not been met. Vasquez argues that the delayed compensation for his CJA-appointed counsel creates a conflict between "counsel's duty to zealously represent [Vasquez] and counsel's need for economic survival" that "undermines the attorney-client relationship and compromises the quality of representation guaranteed by the Sixth Amendment." (Docket No. 34 at 3.) Vasquez has shown neither that any actual conflict of interest exists, or that his counsel is actively representing that conflicting interest.

First, Vasquez's counsel accepted his case on August 5, 2025, which was by her own admission at least a month after CJA-appointed counsel were last reimbursed. (Id. at 2 ("Funding ran out in July 2025, and as a result the undersigned has been working without significant compensation on CJA cases since June 2025.").) Vasquez's argument for a conflict of interest might be more persuasive had his counsel not accepted appointment *after* she was on notice that funding for CJA-appointed counsel had *already been exhausted*. To date, Vasquez's counsel has not filed a motion to withdraw, as would be proper in the event of a *genuine* conflict of interest.

This record suggests either that no actual conflict exists or that it is only theoretical. See Bonin v. Calderon, 59 F.3d 815, 827 (9th Cir. 1995) ("[M]inor or potential conflicts of interest often exist which might theoretically or conceivably affect an attorney's representation, but are not likely to do so.

9

Such 'potential' conflicts are insufficient[.]").

Second, even if there were an actual conflict of interest due to the deferred compensation, Vasquez has not established that his counsel is actively representing that conflicting interest. See Atkins v. Bean, 122 F.4th 760, 786-87 (9th Cir. 2024) (finding no actual conflict where defendant "failed to show any deficient performance by counsel or resulting prejudice."), cert. denied, No. 24-7302, 2025 WL 2906511 (U.S. Oct. 14, 2025).

Counsel's own argument affirms that she has diligently sought to fulfill her professional and ethical duties. "[T]here is a 'presumption that the lawyer will subordinate his pecuniary interests and honor his primary professional responsibility to his clients in the matter at hand.'" United States v. Walter-Eze, 869 F.3d 891, 902 (9th Cir. 2017) (citation omitted). According to Vasquez's motion, "[d]espite the lack of compensation," his counsel has "continued to represent the Defendant to prevent immediate prejudice[.]" (Docket No. 34 at 2.) Indeed, her actions filing this very motion — one which advances a novel legal argument — strongly suggest that she continues to zealously represent her client's interests.

Counsel's contention that due to the lapse in funding, Vasquez cannot access a psychologist in order to evaluate whether he is competent to stand trial is premature at best. Ordinarily, CJA-appointed counsel would first submit a request to retain an expert. The court would then have to approve the request and, eventually, authorize payment for their services at the

10

conclusion of the expert's services.[2] But because no such request has been presented here, the court has not had the opportunity to consider much less approve it. Consequently, the dilemma counsel claims to face is merely hypothetical at this stage and no actual conflicting interest exists for counsel to represent in violation of the Sixth Amendment.

The court is, thus, not persuaded either that Vasquez's counsel is actively representing a conflicting interest or that her delayed compensation constitutes an actual conflict of interest in the first place.

IV. <u>Ake v. Oklahoma</u>

Vasquez argues that "the right to counsel is meaningless without adequate resources to mount an effective defense." (Docket No 34 at 3 (citing <u>Ake v. Oklahoma</u>, 470 U.S. 68, 77 (1985)).) While as a general proposition that is true, it does not apply to this case for the following reasons:

---

[2] In his reply brief, defendant states that "CJA attorneys in the Eastern District of California no longer have any psychologists to call upon for CJA cases, at least until the budget crisis is resolved." He adds that psychologists and other experts will accept CJA cases only if appointed counsel advance their personal funds to cover the expected fees. (Docket No. 37 at 3.) At oral argument, defense counsel stated she had attempted to retain one psychologist who was unavailable, and that she had spoken with 20 other CJA attorneys who told her there were no experts who would accept appointment. Since this is the first time the court has heard any of these hearsay allegations, the government has not had an adequate opportunity to respond to them, nor has the court had an opportunity to explore, through the Federal Defender, whether there are psychologists available to accept the appointment. After all, it is not as if they would not be paid. They would only have to wait for payment until after the shutdown, and they would have to wait until after their services have been performed anyway. It is hard to believe that there is no qualified psychologist who would accept appointment on these terms.

11

1    In Ake, the Supreme Court "focused on identifying the
2 'basic tools of an adequate defense or appeal,'" and "required
3 that such tools be provided to those defendants who cannot afford
4 to pay for them." Ake, 470 U.S. at 77 (citing Britt v. North
5 Carolina, 404 U.S. 226, 227 (1971)).  The specific "tool" at
6 issue in Ake was an expert evaluation by a psychiatrist in
7 support of an insanity defense.  Id. at 72; see also id. at 70
8 ("The issue in this case is whether the Constitution requires
9 that an indigent defendant have access to the psychiatric
10 examination and assistance necessary to prepare an effective
11 defense based on his mental condition, when his sanity at the
12 time of the offense is seriously in question.").

13    In his motion, Vasquez failed to specify any "basic
14 tools" he is being denied as a result of delayed compensation for
15 his CJA-appointed counsel.  Now, for the first time, in Vasquez's
16 reply to the government's opposition to the motion, his attorney
17 indicates that the real problem is that she is unable to explain
18 the procedure for requesting a bail review to Vasquez and that he
19 is immovable in his believe that he is entitled to pretrial
20 release.  As a result, she feels a psychological evaluation of
21 the defendant is a basic resource she needs in order to provide
22 effective representation.  However, she says that "most CJA
23 providers and experts ceased accepting appointments to new cases
24 in July and August of 2025."  (Docket No. 37 at 3.)  She adds
25 that "BOP facility forensic psychologists are currently
26 furloughed.

27    These facts might justify a court session at which the
28 mechanics of pretrial release and bail review are further

explained to Vasquez. They might also justify enlisting the assistance of the Federal Defender's office in finding a qualified expert who is willing to consult with counsel and/or examine the defendant. But other than making passing mention of these options in her reply brief, counsel has made no request for any of them, and dismissal of the indictment is certainly not justified on the basis of this record.

More generally, Vasquez's reliance on Ake is misplaced as the case is properly distinguished because scope of the Court's holding in Ake was limited due to the facts of that case, most especially that it was a capital case: "Nothing in the Court's opinion reaches non-capital cases." Ake, 470 U.S. at 87 (Burger, C.J., concurring) ("The facts of the case and the question presented confine the actual holding of the Court. In capital cases the finality of the sentence imposed warrants protections that may or may not be required in other cases.")). Here, Vasquez has not been charged with a capital offense. (See generally Docket No. 1.)

Further, Vasquez asserts that the "fundamental fairness and equal protection principles inherent in the adversarial system" has been violated because the prosecutors are being compensated while defense counsel are not. (Id. at 3.) But with there being no action in this case other than a continuance of the status conference while Vasquez's counsel caught herself up with the case to date, Vasquez has not pointed to any prosecutorial activities on the part of the government (other than providing Vasquez with discovery) that prejudiced him.

Nor has Vasquez shown how he even *could* be prejudiced

13

1  by the government temporarily continuing to prosecute its case
2  against him given that CJA-appointed counsel, not being salaried,
3  are typically only entitled to reimbursement *after* the conclusion
4  of their representation.  Moreover, even if the Court agreed with
5  Vasquez's on this point, his claim would have been mooted when
6  funding lapsed on October 1, 2025.  Since that date, counsel for
7  the government has been operating under the same reimbursement
8  conditions as CJA-appointed counsel. (Docket No. 36 at 6 n. 6.)

V.   State v. Peart

Vasquez argues that "[a]t least one court has recognized that dismissal may be warranted when systemic underfunding of defense counsel violates constitutional rights." (Docket No. 34 at 4.)  Indeed, Vasquez identifies *only* one case: State v. Peart, 621 So. 2d 780 (La. 1993).  Setting aside the fact that Peart is not a not a federal court decision, but a Louisiana Supreme Court case arising from a state court proceeding, the facts of Peart clearly distinguish it from the facts of this case.

In Peart, the trial court found that Teissier, the defender in question, "was not able to provide his clients with reasonably effective assistance of counsel because of the conditions affecting his work, primarily the large number of cases assigned to him." 621 So. 2d at 784.  The trial court found that,

> At the time of his appointment, Teissier was handling 70 active felony cases.  His clients are routinely incarcerated 30 to 70 days before he meets with them.  In the period between January 1 and August 1, 1991, Teissier represented 418 defendants.  Of these, he entered 130 guilty pleas at arraignment.  He had at

> least one serious case set for trial for every trial date during that period. OIDP has only enough funds to hire three investigators. They are responsible for rendering assistance in more than 7,000 cases per year in the ten sections of Criminal District Court, plus cases in Juvenile Court, Traffic Court, and Magistrates' Court. In a routine case Teissier receives no investigative support at all. There are no funds for expert witnesses. OIDP's library is inadequate.

Id.

Ultimately, the trial court found that the system of compensation for counsel representing indigent defendants "was unconstitutional as applied in the City of New Orleans because it [did] not provide adequate funding for indigent defense and because it place[d] the burden of funding indigent defense on the city of New Orleans." Id. On appeal, the Louisiana Supreme Court overturned the trial court's rulings as to the statutory scheme for funding counsel for indigent defendants and remanded the case back to the trial court for further proceedings. Id. at 792. In particular, on remand the Louisiana high court also found that Peart and other indigent defendants similarly situated may have been deprived of effective assistance of counsel and so instructed the trial court to hold such hearings as necessary to ensure defendants' rights were not violated. Id.

Nothing like the facts in Peart can be found from the record in this case. While a state court in one case found that dismissal may be appropriate on a case-by-case basis where indigent defendants are represented by a wholly under resourced representation funding scheme, the extreme factual context of Peart make it entirely inapplicable to this case.

15

VI. Vasquez's proposed alternative remedies

As alternatives to dismissal of the indictment with prejudice, Vasquez suggests several lesser remedies, which are either unnecessary, inadequate or excessive. Releasing him on his own recognizance fails to either rectify the prejudice or mitigate the conditions giving rise to it and would ignore the Pretrial Services officer's determination that Vasquez poses both a flight risk and an ongoing danger to the public. (See Docket No. 30 at 4.) Issuing an "[o]rder requiring immediate payment of all outstanding fees in all CJA cases". (Id.), is untenable because it is inappropriately broad and would require the court to exercise authority that it does not have – namely, to order the federal government to issue payment of funds not yet appropriated by Congress.

The suggestion that this court should dismiss the Indictment in this federal case in favor of prosecution by the local prosecutor in state court runs afoul of both the concept of federalism and the separation of powers. The Ninth Circuit has cautioned that charging decisions are within the prosecutors', and not the courts', domain. See United States v. Miller, 722 F.2d 562, 565 (9th Cir. 1983). It is within the exclusive province of the United States Attorney to determine what charges are to be brought and where.

VII. Conclusion

This motion is just one of a number of similar motions filed in cases pending in this and other districts seeking to

16

dismiss indictments because of the lack of funds to pay the fees and costs of defense incurred by court-appointed counsel. Counsels' characterization of this situation as unprecedented is more than just a little misleading.  It has been only 32 days since the last batch of CJA payments was issued and 20 days since Congress failed to make appropriations to fund government operations.  While the current lapse in funding may be longer than previous ones, it is certainly not the first.

To put this in historical perspective, during the more than 19 months between the Supreme Court's decision in Gideon and the enactment of the CJA, the courts were required to appoint counsel for indigent defendants, although Congress had not appropriated funds to compensate attorneys to represent such defendants, and there were no paid federal defenders.  The courts' solution for that crisis was not to summarily dismiss the indictments in all pending cases against indigent defendants, nor to preclude the government from bringing such cases, or even to stay the proceedings.  Instead, the lawyers of this community answered the call by willingly undertaking representation of those indigent defendants pro bono.

Subsequently, since the implementation of the Congressional Budget and Impoundment Control Act of 1974, there have been 20 federal government shutdowns due to a lapse in funding, excluding the current shutdown. See CONG. RESEARCH SERV., RL34680, *Shutdown of the Federal Government: Causes, Processes, and Effects* 6 tbl.1 (2019), https://sgp.fas.org/crs/misc/RL34680.pdf.  Throughout this 48-year history, *no* federal court to this court' knowledge has found

17

that the delayed reimbursement of CJA-appointed defense counsel constituted a violation of a defendant's Sixth Amendment right to counsel.

"[T]he power to dismiss an indictment is 'reserved ... for extremely limited circumstances.' Whitehouse v. United States District Court, 53 F.3d 1349, 1360 (1st Cir. 1995) (citing Bank of Nova Scotia v. United States, 487 U.S. 250, 263 (1988))." United States v. Lin, No. 22-CR-10279-AK-11, 2025 WL 641371, at *3 (D. Mass. Feb. 27, 2025).  As such, "[d]ismissal of an indictment is not to be lightly granted." United States v. Soc'y of Indep. Gasoline Marketers, No. B-76-0314, 1977 WL 1508, at *2 (D. Md. Feb. 24, 1977).[3]  For the reasons discussed above, the court finds that Vasquez has failed to show the exceptional circumstances necessary to justify departure from this long-standing precedent counselling against dismissal.

IT IS THEREFORE ORDERED that defendant's Motion to Dismiss (Docket No. 34) be, and the same hereby is, DENIED.

Dated: October 20, 2025

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

---

[3] See also United States v. Filer, 762 F. Supp. 3d 730, 746 (N.D. Ill. 2025), appeal dismissed, No. 25-1079, 2025 WL 1952087 (7th Cir. Jan. 19, 2025) (citations omitted) (holding that "Federal courts are advised to exhibit a modicum of restraint when considering whether to dismiss an indictment because a dismissal encroaches not only upon the fundamental role of the grand jury, but also upon the role of the prosecutor.") (citation omitted)).

18